May it please the court, Barry Tarallo and Tariq Adly for the appellate. Now that we have sent the court a letter and are sure that the issues that were before the motion panel about the improperly designated items that were made part of the record and reserved by the motion panel for this court are in the hands of the appellate. are before the court, I'd like to move on from those questions of what sanctions are appropriate and what is the impact of the improperly concluded materials or included materials on the brief. It would be more helpful to me just speaking for myself. If you would go directly to the issues in the case, the substantive issues that we have to decide. And in particular, I would appreciate your commenting on the convictions, the evidence that supports what I would call the vicarious liability counts. That's what I was planning to do, Your Honor. And as to that question, Your Honor, I think the validity of the jury's verdict or verdict, so what importance you can attach to them, in this case under these facts, can best be seen by looking at the vicarious liability counts, what we call the non-Tarallo counts. Counts 7, 23, and 24. As to those counts, these are sales by other people. There is one, no evidence of involvement by Mr. Tarallo, no participation, no knowledge, no intent, and most important, no instruction or theory to support those convictions. There is no common scheme or plan instruction. There is no Pinkerton instruction, nor are there the vicarious liability instructions that were approved in opinion that you wrote, Judge Graber, U.S. v. Stapleton. There is nothing there. The prosecutor deliberately informed the court that he had not proposed vicarious liability theories in this case. In short, there is no evidence and no justification for those counts. No reported case in this country has ever sustained a conviction in a similar situation to this. The government seems to argue, if I understand their brief correctly, that their theory of aiding and abetting is that because Mr. Tarallo brought money into the operation which kept the other people employed long enough to do what they did, that that's somehow enough for aid and a better liability. They may explain it somewhat differently, but that's kind of how I read it. What's your response to that? My response is this. It is a theory never argued by the prosecution below. It was never raised to the jury. The prosecution did argue the vicarious liability theory that he never asked the court to instruct on, seemingly claiming that his argument is a substitute for the court's instructions. And as the court well knows, aiding and abetting is not some simple concept. It requires intent, knowledge, participation. Mr. Tarallo knew nothing about these transactions. Let me ask you this. Let's assume for a moment that I or the panel agrees with you on those three counts. What is the sort of downstream domino effect of that, assuming that none of your other arguments is accepted, but just focusing on that one? What is the effect on sentencing and other things? The accounts, those counts are then invalid. They any inferences drawn from those counts as to other counts, any evidentiary value is worthless. And I believe there are other issues which strike down the rest of the counts when and if I get to them. I don't understand that. If there are separate counts, let's say there are ten, I don't remember how many there are right at the moment, but if there's not enough evidence on three of them, but there is enough evidence on the other, which is what I would like you to assume, what is the other effect, if any, of insufficient evidence on those three counts? On those three counts, from those three counts, those three counts are gone, and that leaves the rest for me to deal with. I think it's important for the Court to focus on the fact that Mr. Torello was a salesman. He was not a manager. He was not a supervisor. He didn't think up the scam that was involved. Those cases Let me just stop you right there on that. There is evidence that Mr. Torello was telling his clients their money would be held in trust while at the same time he was receiving personal paychecks from the very accounts that he said were trust accounts. Now, isn't this sufficient evidence to have knowledge? No, Your Honor, it isn't. Why not? First of all, we have to have some common sense in dealing with a commercial transaction. Things are being sold. In any public offering, you put up money to buy some stock, and someone gets a commission. Someone gets money. It isn't as if all of the funds for an IPO somehow go to the company who is issuing the IPO. He's being paid. There's no evidence that he noticed the number of different trusts. There's no evidence he noticed it. There's no evidence he knew there was anything inappropriate. I think what is extraordinarily important in this case is the evidence that Mr. Colvin, the founder of the business, attempted to keep the salespeople and the people from the business and the sales department insulated so they would not know what was going on. Well, didn't he also, though, falsely tell people that he had successfully taken companies public before? He had to know that was false. Why is that, Your Honor? There's no evidence in the record that he hadn't done that. Well, there's no evidence that he had. Well, that's right. And the prosecution says that's a false statement. The burden is on the prosecution, as the Court well knows, to prove that it's false. That's one of the things that I wanted to get to about the problem with the misrepresentations and the minor misrepresentations that went to the jury and why it creates such a problem in evaluating the evidence and evaluating the instructions in the case. But what Your Honor just mentioned, I believe, points to one of the serious deficiencies in this case. It says that in the prosecution's brief, but there's no evidence that I recall. Didn't he also say that he was in Washington, D.C. when he was not? Your Honor, he might have. Is there evidence that he did so? First of all, there's no evidence he wasn't. There's a yes or no answer to that question. Did he state that he was in Washington, D.C. when he wasn't in Washington, D.C.? That's a two-part question, Your Honor. The first part is some witnesses did say that he said he was calling from Washington, D.C. The second part of it is, one, there was no evidence he didn't call from Washington, D.C., but I believe that's a so what. If I can get to the puffing instruction, the fact that you're calling from Washington, you're calling from Seattle, you're calling from Los Angeles is irrelevant under appropriate instructions. Well, it seems to me that what your effort is is not to allow the big picture to emerge. Each little thing by itself, you say, is little bitty and shouldn't be allowed to demonstrate fraudulent intent, but intent is something that the jury normally looks at from all the evidence, doesn't it? Well, yes, it is, Your Honor. And if I could address how these things fit together and the kinds of representations that went to the jury and why it's inappropriate, I think the picture of what happened will emerge. But let me, when Your Honor talks Let me just, before you get to that, you say, yes, there was evidence he called from Washington. No, no, no. I'm sorry, Your Honor. I didn't say that. Oh, you didn't say that. I said that witnesses said he said he called from Washington. He said he called from Washington. That he said he called from Washington. There's no evidence that he did not call from Washington. I understand that. But then wasn't there evidence that there was, in fact, no real office in Washington? There was a virtual office, supposedly, in Washington. A virtual office is what? It's whatever you want it to be. It's a post office box. It's a lawyer's office in Los Angeles that you can rent even though you're not there. Thank you. But my most important point about that is I think something like that is puffing as a matter of law. I think the jury decides whether that is puffing. But that's not a material misrepresentation intended to harm anybody. That is a misrepresentation that falls directly within the puffing instruction that was not given. Because it's not a question true or false. It's a question of does it make any difference in the same way as certain representations have been found to be puffing as a matter of law. The next issue, and the jury was left. The major misrepresentations, such as Surgeon General Coop, whether Lamelli had a detox machine that was approved by the FDA, is something Mr. Torello had no concept about. So the prosecution is left with what are minor misrepresentations, if that, or no proof of the misrepresentations. And the difficult problem becomes that the judge wanted to give a special verdict form. The defense agreed to a special verdict form, either having the misrepresentations in the indictment or blanks for the jury to fill in. The prosecution objected, and therefore it wasn't given. And therefore we are here trying to sort out what the misrepresentations were. But these kinds of misrepresentations supposedly went to the jury. He identified himself, instead of saying he was a salesman, he said he was vice president of marketing. A title he had, a title he was given. It's kind of like in the banks. Instead of giving you a raise, they give you a title. And that's supposed to be a misrepresentation. He anglicized his name. He dropped two letters from his first name, the D and the O from Aldo, and he dropped the O from Torello. And that throughout the case was supposedly a serious fraudulent misrepresentation with no proof.   And I'm going to be asking you about the names of the people that you used. Is there anyone who changed his name? Weren't there other people he used, you know, other names than the one I used? I'm glad you asked me that, Your Honor, because I had crossed off that and was going to skip it. But now I – it really was important because you want to know about it. Over out of 100 employees, there was one person who, unbeknownst to anyone else, used a false name. Mr. Coynes, who was the prosecution's witness, said on one occasion he had used a false name with one customer. Of the rest of the 100 people, no. And it's not a false name. It is a name where someone has anglicized their name, as Americans have done forever in this country. There's not a word that it had anything to do with fraud. Or, if the theory is, people don't want to buy things from people who – I thought there was evidence about a Social Security number that had been improperly obtained. Am I mistaken? Your Honor, that's why I wanted to pass on the first issue and maybe get back to it about the evidence that was supposed to be stricken. I just don't think whether there's evidence of that in the record or not. No, Your Honor. It was stricken. That issue is stricken, was improperly designated, never should have been in the brief. It's extra record. I'm asking about the trial record. Extra. Never submitted to the jury, Your Honor. Okay. So the record contains nothing about anyone using a false Social Security number. Never submitted to the jury.  Is there evidence in the trial court record? It's still a yes or no question. No, Your Honor, because it came from a pleading of the government that was – that should have been stricken and the pre-sentence report. It didn't – it was nothing that went to the jury on guilt or innocence. Nothing. And it was never explained by Mr. Torello. He never had the opportunity. That's what's wrong when extra record materials are used in the brief. This is a complicated case, Judge. And I, for – you know, I am glad to have the opportunity to try to explain some of these things, even in the short time I have. But the things that are coming up now are exactly the difficulties that the jury could well have had with this case. And I don't think – well, in any event, with a name, and he failed to volunteer his salary arrangement. He failed to tell the people on the phone that he was on commission. That's also supposed to be a material misrepresentation. Now, let's get to the Blinkoff deposition for a moment, if we could. Well, you have a fair amount of time left, so. You didn't raise this with the district court, did you? I'm sorry, Your Honor. The Blinkoff deposition. It's extraordinarily important. That's not – Judge Nelson asked if you raised this issue below. Oh, yes. Absolutely. Absolutely. It was litigated. It was raised. The objections were made. Mr. Steingart said he'd never, never have stipulated had he known the way he was going to get duped. He said that at the motion. It was raised. The notes that Mr. Steingart asked for as a – handwritten notes asked for as a precondition to signing the agreement was – were not furnished, deliberately not furnished by the prosecutor. The prosecutor knew about them. He never gave them. He had the stipulation signed when he knew they existed. Because of the time, I'm limiting what I'm – You have actually exceeded your time, but we will restore some time for rebuttal because we've asked you quite a few questions. Can I get to – You've exceeded your time, and we will restore some time for rebuttal because we asked a lot of questions. Thank you. Thank you. We'll hear from the government. Your Honor, excuse me. Your Honor, as may it please the Court, Stephen Olsen for the United States. I believe this record contains overwhelming evidence of the defendant knew that his statements and his omissions and his false representations. What was the evidence in the record with respect to liability for the other three individuals, which is a major point that your opponent makes? There's quite a bit, Your Honor. First of all, I think that the critical question there is foreseeability. Were there actions foreseeable to the defendant? Counsel, that's not a theory that was presented by instructions to the jury. The theory that was presented below was aidor and a better liability. Why could the government get those accounts to stand under some other theory now? There may have been evidence for some other theory, but if that other theory was never instructed, I don't see how that helps you. Your Honor, I think it was instructed through the scheme instruction. I think that theory attaches as a matter of law through scheme. The government is entitled to prove and, in fact, must prove that a scheme to defraud existed. Defendant was a knowing participant of that scheme, and therefore it attaches as a matter of law to any mail fraud case. Where on the record do we find that instruction? For example, this would be page 107 on December 30th, which would have been the day that the district court gave their instructions. Page 107. First, defendant devised or knowingly participated in a scheme or plan to defraud. It goes through as one of the key elements of finding somebody liable for mail fraud or, for that matter, securities fraud. But where were they instructed that they had to find that the other individuals for whom he is vicariously liable also were members of the same scheme? Do you see what I'm saying? In other words, co-schemer liability exists when there are co-schemers. And it appeared to me that the jury was instructed that he had to be a co-schemer, but was never instructed that they had to find beyond a reasonable doubt that those other people for whom he allegedly is liable were co-schemers, as distinct from they did something and he aided and abetted them. So that's the difficulty I have with your attempt to resurrect that under a different theory before us than you gave before the jury. Well, actually, I don't think that's the case. I think it was argued in closing by the prosecutor, by the government, that the actions of these other men, Reitz, McLaughlin, Eilers, the other salesmen, were also fraudulent, that they were members of the scheme and the defendant was part of that scheme. Where were they instructed that they had to find beyond a reasonable doubt that those other individuals were part of the scheme? Well, I think, again, it attaches as a matter of law through the instruction on scheme to defraud. And that is exactly what the Court referred the jury to when that question came up. So I don't think you have to have a vicarious liability instruction. In fact, I've tried many of these cases without one. And I think that as long as you have a scheme to defraud, that theory attaches as a matter of law. As the Court has pointed out, it's irrelevant in any event because we also have an aiding and abetting liability instruction. What did they do to aid and abet, in your opinion? What did the defendant do? Yes. Well, many things. First of all, let's not lose sight of what we're talking about here. It was a very small operation and the defendant was an active participant. Other than the fact that they were all sitting in the same office doing the same thing, what did he do to aid and abet specifically what somebody else at some other cubicle was doing, other than being a friendly presence? Well, it wasn't just a friendly presence. He raised substantial amounts of money. He was the top salesman for the scheme, and that money was used to pay for. . . It seems honest. Are you aware of any other case in which that kind of evidence is sufficient to support aid or abet or liability? Or simply made money for the same operation that helped pay the salary of somebody else who then went off and did something else? Well, I think it is relevant. Are you aware of any? No, I'm not. I haven't actually researched that particular question, though. So the answer would be no. But, again, they had daily sales meetings where all the telemarketers met together in a group and discussed what they were doing, and that was presented to the jury, what they were doing, what techniques they were using. Colvin would present new information, and there was quite a bit of give and take during those discussions. That was testified to by telemarketer Coynes, who was the cooperator in this case. Let's assume for just a moment that we don't agree with you on those three counts. Opposing counsel believes that resentencing would be required, but is there anything else that would be required or would flow from that view? No, I don't think so. First of all, the defendant would still be liable for the amount raised. I don't think there's any question about that, that the entire amount raised in the scheme was foreseeable to the defendant. So I don't think there would be any effect whatsoever if the court were to make that ruling. The evidence for that is actually overwhelming in this case because you have this giant tote board that actually recorded the total sales by all the salesmen, and it was up there all month long for every salesman to see. I've seen those pictures in the record, so your argument is that theoretically it would involve resentencing, but the practical effect would be very limited. The practical effect would be null. It wouldn't have any effect whatsoever. And the evidence, and counsel tried to say that the evidence of those other counts is irrelevant. Again, that's not true because the government was required to prove a scheme to defraud. As part of that scheme to defraud, we had to put on evidence of what the operation was doing. And what the co-defendant, Coyne, said is that he was doing the same things. He was making these lies. He knew he was lying about the trust accounts. He knew he was lying about the trust being in Washington, D.C. He knew he was lying about the Wall Street Research Report being an independent entity, when in fact it wasn't. And would you also then address the argument of opposing counsel concerning the evidence of this defendant's intention to defraud, which things he knew were lies and how we know that he knew they were lies? I think there's lots of evidence to that point, Your Honor. One thing I'd like to start with right off the bat before I run out of time is I don't think it's proper to say, let's say a defendant is right, that there is one thing that was said by the defendant that is not material. There's not sufficient evidence of materiality. I don't think this Court should presume that the jury based its verdict on that piece of evidence. I think the Griffin case, I have a cite for you, Your Honors, is directly on point there. I think that's the seminal case in this area. This is a U.S. Supreme Court case, 112 Supreme Court 466. It's Griffin v. U.S. And that says that that is the province of the jury to make those determinations. In other words, this Court must presume that the jury also would have decided that there wasn't sufficient evidence of materiality on that point and held the defendant liable for the scheme on another piece of evidence. That is the exclusive province of the jury. Let me just ask, was there any evidence submitted of the other's criminal liability, the other salespeople? Extensively, extensive evidence. First of all, you had Coins, who admitted his own liability. He admitted that he was lying. Coins is another one of the telemarketers. You also had lots of evidence that was presented to the jury from the other telemarketers in the form of lies that they made directly to witnesses. In other words, we put on witnesses, investor victims, that did not speak to the defendant but only spoke to others as well. And those statements that they made, for example, the trust accounts are holding the money securely. Well, we know that is a lie, and they knew it was a lie, just like defendant, because they were repeatedly paid from those very same trusts. The checks had the payer information. Well, his response was that those are the ordinary commissions one gets. Right. And that would be fine if it wasn't for the representation that the investor's money was being held in trust. And, in fact, they actually went so far as to say it's just like an escrow account. And the jury was presented with that evidence as well that came in the form of the various scripts that the government introduced that were actually in pictures of them posted up around defendant's desk. One of the scripts said, these trust accounts are like escrow accounts. And the victims repeatedly testified that that was critical to them. That was the most important thing. The Wall Street Research Proof is very similar as well. The defendant stressed the importance of that independent analysis and recommendation to buy the stock. Well, we know that he knew that the Wall Street Research Report was not independent but was wholly created by Colvin. We know that because Coyne says that Colvin tells everyone that. We know that because defendant is also paid from the Wall Street Research Company. Repeated checks with that being the payer information. So he would have to know, receiving money from them, that they are not independent of the entity that he is serving. That's correct. He also had a phone list, internal phone list, with his phone number on it and Wall Street Research Company printed on the top. So there's just overwhelming evidence of that. I'd like to address a couple of points in my time remaining. One of your honors asked the question, was there any evidence that he didn't take the companies public? Well, there was plenty of evidence of that. The FBI agent and the SEC receiver both testified that none of these companies were taken public. There was absolutely no evidence whatsoever that any of these companies were ever successfully taken public. And defendant, of course, knew that. And yet he kept selling shares in the same stocks eight months later. Eight months after promising an investor that, for example, Medical Advantage would go public in two weeks, eight months later he's still selling the same shares to, for example, a person like Teresa Geronik who lost $120,000 from this defendant. And she kept getting repeatedly reloaded. And I think the reloading is the critical evidence of defendant's intent to defraud in this case. There are so many things, fake confirmation codes that defendant would put on his material sent out to the investor victims. This is something that I don't believe we put into our brief, but I think it's important. There's plenty of evidence that was submitted at trial from coins. Agent Goldman testified that a particular investor would get – defendant would use the same confirmation code for five different investors or seven different investors. And coins testified that they just made that up, that that confirmation code had absolutely no significance whatsoever. And I would submit that is a sign of fraud. I would point out that the – the materiality instruction, just to get to the instructions for a moment, the materiality instruction that was given by this court for mail fraud was upheld word for word in U.S. v. Woods. That was a case defendant cited in their 28J letter. That's 335 F3rd at 1000. That was a recent telemarketing case by this court. That instruction was upheld word for word. I think on the recklessness issue, Your Honors haven't asked any questions about that, but I would also point out that I think it's proper to analogize to 18 U.S.C. 1001, which also uses knowingly and willfully. And there is case law that suggests that recklessness is sufficient scienter under 1001. There's a Fifth Circuit case called Puente. There's a Second Circuit case called Abrams. I think that's a proper analogy. In addition, I think the court properly refused to give the willfully instruction for securities fraud, and I think defendants cannot distinguish from the English case, which I think this circuit definitively decided that issue. And the cases they cite are wholly different because there the court was concerned about criminalizing potentially innocent behavior. None of that is relevant here because this is a garden variety fraud case, and that's what English makes clear. Let me ask you quickly about the O'Hagan case of the Eighth Circuit. Would we be creating a circuit split if we held that reckless disregard for truth or falsity is sufficient to establish criminal liability? No, and I'm glad you asked that question, Your Honor. Not at all. The O'Hagan case relied on and concerned a misappropriation theory of knowledge, of information. And the question the court was wrestling with there is, is it fair to hold the defendant liable under this unique and new novel approach? And so there the court was concerned with that willfully instruction. I don't think, but then if you look at what they say about it, their definition of willfully is really no different than knowingly, which is what this court did in this case. But again, the point I'd like to stress is that is a misappropriation of knowledge case and an insider trading theory that was novel, at least at the time. And that is the reason that the court said that. Now, the Supreme Court did not say that you must give a, or excuse me, that recklessness does not suffice. That's not what the Supreme Court said. But you're right, the Eighth Circuit made that comment on the remand in O'Hagan. But that would not be a circuit split, I do not believe, because that case is distinguishable on its fact. In other words, it's more akin to the Rosloff type cases in a tax area or some other case that deals with a more technical issue and not garden variety fraud case here. There's no question the defendant knew what he was doing was wrong. He was lying to people. And that's not something that we need to ensure that people aren't accidentally committing crimes. Thank you. Thank you, counsel. Your time has expired. Okay, thank you. Mr. Tarlow, you may have two minutes restored for the vote. Let's see how quickly I can do this. The answer you received when you asked or the question was asked about was there, about whether he brought things public in the past, had nothing to do with the question asked. What you were told was none of the IPOs in this case went public. There's no evidence as to he did not bring something public in the past. Now, when there's supposedly plenty of evidence as to the non-Torello counts, the people who sold those transactions never testified in this case. There was no testimony about those transactions by the salespeople. As to when, I was asked a question before about him being paid by the trust. The record shows he was an employee of the trust. And I can get the site if that's important, but that's what it shows. Well, what about when he says it's like an escrow account? I'm not sure that specific statement appears in the record or not, but he's got to be paid for his work. Somebody has to pay him. And that's something that's on a wall someplace. And I wish Judge Nelson I had a moment to deal with it then. The blink-off deposition goes to every count in this case if that testimony is invalid. There was no limiting instruction regarding the use of the blink-off testimony. It was admitted for all purposes. If blink-off's testimony, if the offense was duped into the stipulation, there was a violation of the right to confrontation, it affects every count in this case. Finally, as to the puffing instruction in this case, which I think is the key to the case, defendant's theory of the case instruction, which requires, in this case it was proposed, in this case it was not given, puffing is different than good faith. It has no relation. The Amaui case, or Melvin case, cited by the prosecution, the two concepts were coextensive. That is, that in that case, either it was good faith, I'm sorry, either the statement was false and the owner of the business knew it or it wasn't. That's what was involved in that case. In this case, good faith is a totally separate concept. It is a theory of defense instruction reviewed differently than any other kind of instruction. It's de novo review because it was proposed. Finally, and in concluding, the definition of intent to defraud and leaving out and as intent to deceive is deficient. There would be a circuit split. The first, second, third, sixth and eighth circuits have ruled that intent to harm has to be part or some similar concept, equivalent intent to cause loss, has to be part of an intent to defraud instruction. This is an open question in the Ninth Circuit. The Ninth Circuit has not decided it. And if this circuit decides different than the six other circuits that have decided it, in fact, there would be a circuit split. The instruction was absolutely wrong. Finally, and in conclusion on the recklessness question that you asked about, Judge Nelson, defense proposed a definition of, excuse me, the court gave a knowing instruction plus recklessness as to the securities fraud. It did not give willfulness. Willfulness is different than recklessness. The instruction was proposed. It was not given. So far as I know, in most cases, knowingly means absolutely nothing. It almost means you are conscious and you see and something happens. And that's about it. Willfulness is something totally different. The instruction was not given. Thank you, counsel. The case just argued is submitted. We appreciate the arguments of both parties. And we will turn to the last case on the morning docket, which is United States v. SANA.
judges: Gibson , Dw Nelson, Graber